USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/31/20

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
SS&C TECHNOLOGY HOLDINGS, INC.,      :
                                     :
               Plaintiff,            :     19-cv-7859 (JSR)
                                     :
          -v-                        :
                                     :     MEMORANDUM ORDER
AIG SPECIALTY INSURANCE COMPANY,     :
                                     :
               Defendant.            :
------------------------------------ x
```

JED S. RAKOFF, U.S.D.J.

Plaintiff SS&C Technologies Holdings, Inc. ("SS&C") brought the instant action against defendant AIG Specialty Insurance Company ("AIG"), alleging that AIG unjustifiably refused to provide coverage under the insurance policy that SS&C had purchased. Complaint, ECF No. 1 ("Complaint"). Now before the Court are the parties' cross-motions for summary judgment in their respective favor on SS&C's claims for breach of contract ("Count One") and breach of the implied covenant of good faith and fair dealing ("Count Three").[1] For the reasons set forth below, the Court grants summary judgment in favor of SS&C on Count One and in favor of AIG on Count Three.

## Factual Background

Except where otherwise noted, the following undisputed facts are taken from the parties' Rule 56.1 Statements.

---

[1] Count Two, a claim for declaratory judgment, was dismissed in the Court's memorandum order dated November 5, 2019. See ECF No. 28, at 9-11.

Plaintiff SS&C is a financial technology company that provides, <u>inter alia</u>, business processing management services to its clients. Plaintiff's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, ECF No. 40 ("SS&C 56.1") ¶¶ 21, 22. In early 2012, SS&C started providing such back-office services to its client Tillage Commodities Fund, L.P. ("Tillage"), pursuant to an Agreement to Provide Administrative Services. ECF No. 41-10 ("Services Agreement").

On April 29, 2015, AIG issued Specialty Risk Protector Policy No. 01-274-16-88 to SS&C, with the policy period running from April 30, 2015 to April 30, 2016. Policy, ECF No. 41-2 ("Policy"); SS&C 56.1 ¶ 1; Defendant's Statement of Material Facts and Evidence in Support of Motion for Summary Judgment, ECF No. 45 ("AIG 56.1") ¶ 21. The Special Professional Liability Coverage Section in the Policy provides: "The Insured shall pay on an Insured's behalf all Loss in excess of the applicable Retention that such Insured is legally obligated to pay resulting from a Claim alleging a Wrongful Act." Policy 65.[2] The

---

[2] "Loss" is defined to include "compensatory damages, judgments, settlements, pre-judgment and post-judgment interest and Defense Costs." Policy 66. "Claim" is defined to include a "Suit," which in turn is defined as "a civil proceeding for monetary, non-monetary, or injunctive relief, which is commenced by service of a complaint or similar pleading." <u>Id.</u> "Wrongful Act" is defined as "any negligent act, error or omissions, misstatement or

2

Policy contains various exclusionary provisions, discussed in more details below.

Beginning on March 3, 2016, unknown third parties using "spoof" e-mail domains sent fraudulent transfer requests to SS&C, falsely claiming to be acting on behalf of Tillage. SS&C 56.1 ¶ 25. Believing these requests to be coming from Tillage, SS&C, over the course of three weeks, processed wire transfers of approximately $5.9 million from Tillage's accounts to certain bank accounts in Hong Kong, as requested by the fraudsters. Id.

On September 16, 2016, Tillage filed suit against SS&C in New York Supreme Court, alleging that SS&C was grossly negligent in handling Tillage's funds by processing fraudulent wire transfers, breached the Services Agreement, breached the implied covenant of good faith and fair dealing, and violated certain provisions of the New York General Business Law ("N.Y. Gen. Bus. L.") regarding deceptive trade practices. See Tillage Commodities Fund, L.P. v. SS&C Technologies, Inc., No. 654765/2016 (Sup. Ct., N.Y. Cnty.) (the "Tillage Action"). The relief sought included "no less than $10 million" in damages from SS&C. SS&C 56.1 ¶ 27. Subsequently, SS&C's motion to

---

misleading statement in an Insured's performance of Professional Services for others occurring on or after the Retroactive Date and prior to the end of the Policy Period." Id. at 67.

3

dismiss the N.Y. Gen. Bus. L. claims was granted, and its motion to dismiss the claim for breach of contract was denied. SS&C 56.1 ¶ 32. On June 4, 2019, the Tillage Action was settled. SS&C 56.1 ¶¶ 39-40; AIG 56.1 ¶ 28. By the time of the settlement, the only remaining claim was the claim for breach of contract remained. AIG 56.1 ¶¶ 14-15, 27, 30.³

On March 28, 2016, shortly after the fraudulent scheme was uncovered, SS&C timely notified AIG of the incident and indicated that the incident might give rise to a covered Loss under the Policy. Letter from AON to AIG, dated March 28, 2016, ECF No. 41-31. On September 28, 2016, Kris Cappelluti, a senior claims analyst at AIG, sent a letter to SS&C, acknowledging that the Tillage Action fell within the Specialty Professional Liability Insurance provisions and agreeing to cover SS&C's defense costs related to the Tillage Action. Letter dated September 28, 2016, ECF No. 41-34 (the "September 2016 Letter"). However, in the same letter, AIG denied indemnity coverage for any settlement relating to the Tillage Action, asserting, inter alia, that Exclusion INV(a) of Endorsement #5 "expressly

---

³ The parties dispute whether the settlement related solely to the claim for breach of contract, but this dispute does not affect the holdings in this memorandum order. AIG 56.1 ¶ 16; Plaintiff's Counterstatement of Undisputed Material Facts, ECF No. 55 ("SS&C CS 56.1") ¶ 16.

excludes indemnity coverage for the $5.9 million lost in this alleged fraudulent email scheme." Id. AIG also stated in the letter that Exclusions 3(a), 3(h), 3(j)(2), 3(j)(5), 3(j)(7), 3(j)(10), and 3(p) might also apply to preclude coverage depending on facts largely unknown at the time, such as the final outcome of the Tillage Action. Id.

Although AIG paid for SS&C's defense costs during the Tillage Action, AIG continued to refuse to cover for the settlement payout, thus precipitating this lawsuit. SS&C 56.1 ¶ 49; AIG 56.1 ¶ 32. Id.

**Procedural Background**

On August 21, 2019, SS&C brought the instant three-count action against AIG, making (1) a claim for breach of contract, (2) a request for a declaratory judgment that there is coverage available for SS&C's settlement claim under the Policy, and (3) a claim for breach of the implied covenant of good faith and fair dealing. Complaint ¶¶ 32-54. AIG moved to dismiss. ECF No. 22. On November 5, 2019, the Court granted AIG's motion to dismiss Count Two as duplicative of Count One, but denied the motion in all other respects. ECF No. 28. On November 19, 2019, AIG filed an answer and affirmative defenses. Answer and Affirmative Defenses, ECF No. 34 ("Answer").

5

Now before the Court are the parties' cross-motions for summary judgment in their respective favor on Count One and Count Three. ECF No. 38; Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, ECF No. 39 ("SS&C Mem."); ECF No. 43; Memorandum of Law in Support of Defendant AIG Specialty Insurance Company's Motion for Summary Judgment, ECF No. 44 ("AIG Mem."). Each party opposes the other party's motion. Memorandum of Law in Opposition to Plaintiff SS&C Technologies Holdings, Inc.'s Motion for Summary Judgment, ECF No. 47 ("AIG Opp."); Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, ECF No. 53 ("SS&C Opp.").

## Analysis

Under Rule 56(a) of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The movant bears the burden of demonstrating the absence of a genuine dispute of fact, and, to award summary judgment, the court must be able to find after drawing all reasonable inferences in favor of a non-movant that no reasonable trier of fact could find in

favor of that party." Palmer/Kane LLC v. Rosen Book Works LLC, 204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016).[4]

## I. Claim for Breach of Contract (Count One)

Under applicable Connecticut law,[5] an insurance policy "is to be interpreted by the same general rules that govern the construction of any written contract." Connecticut Med. Ins. Co. v. Kulikowski, 942 A.2d 334, 338 (Conn. 2008). In accordance with this principle, "[t]he determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy." Schilberg Integrated Metals Corp. v. Continental Cas. Co., 819 A.2d 773, 789 (Conn. 2003).

Also under applicable Connecticut law, the elements of a breach of contract action are "the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." Rosato v. Mascardo, 844 A.2d 893, 902 (Conn. Ct. App. 2004). The only element in dispute is whether AIG breached the Policy – put differently, whether any exclusionary

---

[4] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

[5] The Court has previously determined that Connecticut law governs the Policy. ECF No. 28, at 5 n.3.

provision in the Policy precludes coverage. In this action, AIG has predicated its defense on Exclusion INV(a) of Endorsement #5 and Exclusion 3(j)(10). Answer 8-9.[6]

**Exclusion INV(a) of Endorsement #5**

Exclusion INV(a) of Endorsement #5, with the heading "Modified Investment Advisor Exclusion Endorsement,"[7] precludes coverage for:

> Loss in connection with a Claim made against an Insured alleging, arising out of, based upon or attributable to . . . the exercise of any authority or discretionary control by an Insured with respect to any client's funds or accounts. Provided, however, that this exclusion shall not apply to any Claim arising out of your performance of Professional Services. Notwithstanding the foregoing sentence, it is expressly understood and agreed that there shall be no coverage for the monetary value of any funds lost due to the Insured' exercise of such authority or discretionary control . . . .

Policy 88.

---

[6] After the Court's previous memorandum order determining that Exclusion 3(a) was not a viable defense to Count One, AIG dropped that defense. Furthermore, in this action, AIG does not rely on Exclusions 3(h), 3(j)(2), 3(p), 3(j)(7), and 3(j)(5), which the September 2016 Letter had noted as possibly applicable.

[7] The parties agree that SS&C was not an investment advisor for Tillage. SS&C 56.1 ¶ 72; AIG CS 56.1 ¶ 72. SS&C focuses on this heading to argue that Exclusion INV(a) contemplated exclusion of losses stemming from investment advice, whereas SS&C was not such an investment advisor. SS&C Mem. 12. However, the Policy explicitly states that "[t]he descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage." Policy 19.

8

The parties do not dispute that the "Provided, however" exception to exclusion coverage applies in the present context. That is, the Tillage Action arose out of SS&C's provision of Professional Services – defined to include "business processing outsourcing services including fund administration services, reporting services, transaction processing services and reconciliation services," see Policy 101 – as a fund administrator to Tillage. SS&C Mem. 14-15; AIG Opp. 8-10. Therefore, the main dispute here is whether the final "Notwithstanding" clause, a carve-out to the "Provided, however" clause, is applicable.

### 1. Whether SS&C had "authority or discretionary control" over Tillage's funds

Undisputed facts clearly establish that SS&C lacked authority or discretionary control over Tillage's funds and accounts. The Services Agreement states:

> The management and control of the Fund [(i.e., Tillage)[8]] is vested exclusively in [Tillage Commodities Management LLC] . . . . [Tillage Commodities Management LLC] will make all decisions . . . and authorize all transactions. . . . SS&C will not maintain custody of any cash or securities, will not have the ability to authorize

---

[8] "Fund" in the Services Agreement is defined as a "private investment vehicle managed or advised by Tillage Commodities Management, LLC." Services Agreement 2. Exhibit A to the Services Agreement identifies the Fund as Tillage Commodities Fund, L.P. (i.e., Tillage). Services Agreement 14.

9

> transactions . . . and will not . . . make any management
> decisions with regard to the operation of the Fund.

Services Agreement 6. Consistent with this provision, during the course of the Tillage Action, SS&C and Tillage asserted that redemptions and withdrawals would be made "upon approval from" Tillage, that SS&C itself did "not have the ability to authorize transactions," and that SS&C "did not have authority to perform any management functions or make any management decisions with respect to the Fund." SS&C 56.1 ¶¶ 29-30, 74; Defendant's Counterstatement to Plaintiff's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, ECF No. 52 ("AIG CS 56.1") ¶¶ 29-30, 74; SS&C Opp. 10.

AIG nonetheless argues that SS&C had authority and discretionary control over Tillage's funds because, under a Partnership Authorization between Tillage and First Republic Bank (which maintained Tillage's account), five SS&C employees were identified as "Authorized Signers" on Tillage's account and could "sign checks on, issue stop payment orders regarding, or withdraw funds from, any account in the name of the Partnership." AIG 56.1 ¶¶ 37-38, 42; SS&C 56.1 ¶ 24. To release a wire transfer, SS&C had "entitlement rights" to access the bank over the internet so that SS&C's staff could "log into the banking portal directly to do an enter, approval, and release

10

function on the web portal." AIG 56.1 ¶ 35. Furthermore, SS&C had the discretion to determine whether withdrawal requests were proper, to delay a transfer to request additional information, or to direct the bank to transfer funds. AIG 56.1 ¶¶ 34, 43-45, 48; SS&C CS 56.1 ¶ 45.

However, AIG is erroneously conflating SS&C's administrative ability to operate Tillage's account, which undisputedly existed, with SS&C's authority and discretionary control over that account. Although SS&C had the ability to transfer Tillage's funds and five SS&C individuals were authorized signatories for Tillage's bank account for such purpose, SS&C could exercise such authority only with instructions (e.g., signed letter of authorization) from Tillage. SS&C 56.1 ¶¶ 24, 75; AIG CS 56.1 ¶ 24; SS&C Opp. 9-11; see also Transcript of Matthew Balemian Deposition, ECF No. 41-4, at 51:14-18. The fact that an SS&C employee had the ability, without Tillage's authorization or oversight, to put in place instructions that caused SS&C treasury group to transfer Tillage funds to the third-party fraudsters supports a finding that SS&C

acted without Tillage's authorization in that instance, rather than that SS&C had a discretionary control over Tillage's funds.[9]

The Court therefore concludes that SS&C lacked authority and discretionary control over Tillage's funds, and that there is no genuine dispute as to this conclusion.

### 2. Whether Tillage's funds were "lost"

While the foregoing is sufficient to show that the "Notwithstanding" clause does not exclude SS&C's claim, SS&C independently argues that the "Notwithstanding" exclusion does not apply in any case because it only applies to funds that were "lost," but not stolen. SS&C Mem. 15-16.

In addition, SS&C is entitled to summary judgment on the issue of whether Exclusion INV(a) is applicable on an alternative ground that it is ambiguous as to whether Tillage's funds were "lost."

Because the term "lost" is not defined in the Policy, the Court must give the word its "ordinary meaning." R.T. Vanderbilt Co. v. Cont'l Gas. Co., 870 A.2d 1048, 1058-59 (Conn. 2015).

---

[9] Furthermore, SS&C's rights under the Services Agreement to ensure it "has sufficient and appropriate information and material to discharge its obligations" relates to the performance of "OFAC and other verifications relevant for compliance with applicable anti-money laundering rules and regulations." Transcript of Matthew Balemian Deposition, ECF No. 54-2, at 14:1-22; see also Services Agreement 3.

Focusing on the notion that the terms "lost" and "stolen" embody two distinct concepts, SS&C argues that the funds at issue were stolen, rather than lost, rendering the last sentence of Exclusion INV(a) inapplicable. SS&C Mem. 15-16 (comparing the definition of Lost ("(Of property) beyond the possession and custody of its owner and not locatable by diligent search."), with that of Stolen Property ("Goods acquired by larceny, robbery, or theft.") in Black's Law Dictionary (11th ed. 2019)). In contrast, AIG focuses on the idea that those two terms are not mutually exclusive: in AIG's view, the funds at issue were, broadly speaking, "lost." AIG Mem. 12-14; AIG Opp. 16 (relying on the definition of Lost ("no longer possessed" or "taken away or beyond reach or attainment") in Merriam Webster Dictionary, http://www.merriam-webster.com/dictionary/lost (last visited Jan. 27, 2020)).

The Court finds both parties' interpretations equally plausible. Because the ambiguity must be resolved in favor of the insured (SS&C), it follows that even if the "Notwithstanding" clause did not apply because SS&C lacked "authority or discretionary control," as discussed above, it would independently not apply because the funds were not "lost"

13

but rather "stolen." Either way, Exclusion INV(a) does not exclude the coverage of claim by SS&C.[10]

For the foregoing reasons, the Court grants summary judgment in favor of SS&C on Count One.

## II. Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Three)

Under applicable Connecticut law, "[t]o constitute a breach of the implied covenant of good faith and fair dealing, the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 849 A.2d 382, 388 (Conn. 2004). "Bad faith in general implies . . . a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." Capstone Bldg. Corp. v. Am. Motorists Ins. Co., 67 A.3d 961, 987 (Conn. 2013).

---

[10] In its Answer to the Complaint, AIG also relied on Exclusion 3(j)(10) to deny coverage. However, in its summary judgment briefs, AIG does not challenge SS&C's argument that Exclusion 3(j)(10) is inapplicable. Therefore, the Court deems AIG's defense predicated on Exclusion 3(j)(10) to be waived. See Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003).

14

SS&C puts forth several reasons why the Court should find bad faith on AIG's part. First, SS&C argues that AIG relied on exclusions that allegedly had no relevance to the underlying facts of the Tillage Action. SS&C Mem. 19-20. For instance, SS&C argues, Tillage's complaint, as well as subsequent documents produced during the Tillage Action, made clear that SS&C lacked any authority or discretionary control over Tillage's funds and account, but AIG still refused to yield its coverage position, allegedly demonstrating bad faith. SS&C 56.1 ¶ 74. But, as the discussion above illustrates, AIG's position on this issue, while ultimately lacking in merit, was not so totally frivolous as to warrant the inference that it was made in bad faith.[11]

Second, SS&C argues that the Court should find bad faith because AIG shifted its coverage position at various points in

---

[11] As an additional example, SS&C refers to the deposition testimony by Wolfe, AIG's 30(b)(6) representative, that, although the transfers in question did not flow into or out of an SS&C account, he believed Exclusion 3(j)(5) – which applied only with respect to lost or diminished funds during the transfer into or out of SS&C's account – still denied coverage for the Tillage Action. Wolfe Dep. 143:9-146:22. Also, Wolfe maintained that Exclusions 3(j)(2) and 3(p) continued to apply even after the claims based on N.Y. Gen. Bus. L. were dismissed, although those exclusions were largely predicated on those claims. Wolfe Dep. 134:23-139:9, 150:9-153:11.
   However, AIG is not taking those positions asserted by Wolfe in this litigation. AIG Opp. 24 n.14. Therefore, the Court finds Wolfe's testimony in this respect largely irrelevant to discerning whether AIG relied on exclusions that have no relevance to the underlying facts of the Tillage Action.

15

time, without reasonable basis, in an alleged attempt to justify denial of coverage. SS&C Mem. 20-22; SS&C Opp. 22-23. For instance, AIG stated in its September 2016 Letter that "a final adjudication of the [allegation that SS&C worked with the fraudsters] could exclude . . . indemnity coverage for this matter and trigger our right to recoup," whereas, at the motion to dismiss stage of this action, AIG argued that allegations based on the conduct of the third-party fraudsters, even in the absence of any wrongdoing on SS&C's part, would exclude indemnity coverage. September 2016 Letter; ECF No. 22, at 6-8.[12]

---

[12] SS&C also argues that AIG never before asserted that the conduct of third parties alone could trigger Exclusion 3(a). SS&C Mem. 22. In support of that proposition, SS&C points to the deposition testimony by Cappelluti, the claims examiner who wrote the September 2016 Letter, that she did not believe Exclusion 3(a) applied to the fraudulent conduct of the third parties. Transcript of Kris Cappelluti Deposition, ECF No. 41-5, at 100:8-12. SS&C also points to a claim it filed for coverage in Bradshaw et al. v. Maiden et al., No. 14-cv-14445 (N.C. Super. Ct.) (the "Maiden Action"), where AIG responded that Exclusion 3(a) "may" act to deny coverage depending on whether the allegations that SS&C played a "key role in Maiden's Ponzi scheme" are true. SS&C 56.1 ¶ 54.
    However, Cappelluti's testimony and the Maiden Action alone are not sufficient to extrapolate that AIG has never taken the position that it took regarding Exclusion 3(a) here. And Wolfe and the underwriter of the Policy testified that they thought Exclusion 3(a) precluded indemnity coverage for fraud, regardless of who the perpetrator was. Transcript of Christopher Wolfe Deposition, ECF No. 41-3 ("Wolfe Dep."), at 163:3-167:22; Transcript of Jeffrey R. Kalustian Deposition, ECF No. 49-5, at 18:7-10, 92:3-93:25.

16

However, as AIG's counsel noted at oral argument, see Transcript, 1/24/20, an insurance company inevitably has to assert all possible reasons for exclusion at the earliest time, for fear of later being found to have waived such exclusions. Then, after further review, the company will drop many of the asserted grounds for exclusion after more detailed inquiry. This may be a hard-nosed approach, but it hardly amounts to bad faith. See, e.g., McCulloch v. Hartford Life & Acc. Ins. Co., 363 F. Supp. 2d 169, 177 (D. Conn. 2005). And in this case, in particular, it was entirely within reason that, because of lack of full information when the Tillage Action just began, AIG took tentative positions on various exclusionary provisions in its September 2016 Letter that AIG subsequently revisited.

## Conclusion

In sum, the Court grants summary judgment in favor of SS&C on Count One, finding AIG liable for breach of contract, and in favor of AIG on Count Three, finding that the claim of bad faith should be dismissed. Counsel are hereby directed to jointly call chambers by no later than February 4, 2020, at 5:00 p.m. to inform the Court of what further proceedings are necessary in this action.

The Clerk of the Court should close the docket entries 38, 43.

SO ORDERED.

Dated: New York, NY
January 29, 2019

_____
JED S. RAKOFF, U.S.D.J.